IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLOTTE GORDON, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ANDREW MARSHALL SAUL, ) <br> Commissioner of Social Security, ) <br> ) <br> Defendant. ) | No. 18 C 07096 <br><br> Judge John J. Tharp, Jr. |

## MEMORANDUM OPINION AND ORDER

Claimant Charlotte Gordon seeks judicial review of the Commissioner of Social Security's determination that she is not disabled and therefore ineligible to receive disability insurance benefits. Before the Court is the plaintiff's brief in support of reversing the Commissioner's decision, and the Commissioner's motion for summary judgment. Dkts. 15, 25. For the following reasons, Gordon's motion is granted, the Commissioner's motion is denied, and the case is remanded to the Commissioner for further proceedings.

### BACKGROUND

**A.    Procedural Background**

On July 8, 2015, Charlotte Gordon filed a claim with the Social Security Administration for a period of disability and to receive disability insurance benefits. Gordon alleges that she became disabled on June 26, 2015. R. 268.[1] The Commissioner denied her claim and her request for reconsideration. R. 167, 182. Gordon then sought and received a hearing before an administrative law judge ("ALJ"). R. 196, 227. The ALJ held a hearing on August 16, 2017, and

---

[1] Citations to R. refer to pages in the administrative record, which was filed as Dkt. 6.

denied Gordon's claim on December 7, 2017. R. 93, 72. Gordon appealed the ALJ's decision to the Social Security Appeals Council, which denied her request for review—rendering the ALJ's decision the final decision of the Commissioner. R. 1; *see Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). Gordon filed this action for judicial review pursuant to 42 U.S.C. § 405(g) in 2018.

### B. Factual and Medical Background

Charlotte Gordon was born on October 7, 1957, and was 57 years old when the claimed disability period started. R. 143. She has a high school diploma and completed two years of college. R. 300. From 1991 until June 2015, she was employed full-time by United Airlines as a reservation agent in Algonquin, Illinois. R. 300, 104. Her job responsibilities included booking flights and changing flight reservations for United customers, both over the phone and in person. R. 165. She spent about half of her workday using a computer. *Id.* Gordon took a six-month period of intermittent leave from her position in 2012 due to a major depressive disorder and anxiety, and another period of leave in 2014 due to neck and lower back pain. R. 408, 427. In May 2015, she received notification that she was being terminated, as she had "failed to maintain an acceptable level of dependability" given her numerous absences in the preceding 12-month period. R. 477. Gordon was given the opportunity to retire rather than face termination, which she accepted. R. 105.

Gordon is seeking disability primarily based on depression, back and neck pain, and obesity; she additionally cites high blood pressure, diverticulitis, and acid reflux. R. 299. In her application for disability benefits, Gordon indicated that her conditions made it difficult to work by limiting her ability to lift objects, and that her depression left her "overwhelmed sometimes," leading her to miss work. R. 314. The medical record largely corroborates Gordon's claims. Gordon has been diagnosed with moderate major depressive disorder. R. 697. Dr. Kucera, a

2

licensed clinical psychologist, concluded that Gordon demonstrated an "impairment in immediate and delayed memories," mild impairment in her "abstract thinking ability as well as her judgment and insight," and "had difficulty with her concentration"; Dr. Kucera otherwise found her to be "logical and goal directed," "fully alert and oriented," and "polite, cooperative, and attentive" throughout her evaluation. R. 697. Gordon takes anti-depressants, which are reportedly effective in alleviating her depressive symptoms. R. 529, 149, 112. Gordon's neck and back difficulties are similarly well-documented. MRI imaging confirmed severe spinal stenosis, multilevel spondylosis, and ventral effacement of the thecal sac. R. 923-24. In 2015, Gordon received both a cervical trigger point injection and a cervical epidural steroid injection, and in May 2016, Gordon underwent a laminectomy. R. 770, 783, 1627. When Gordon presented with neck pain in late 2016 and early 2017, further MRI imaging revealed that her spinal stenosis had worsened, putting her at greater risk for spinal cord injury and possibly paralysis, especially if she suffered any trauma to the spine. R. 1038. In June 2017, Gordon underwent an anterior cervical hemi corpectomy. R. 1514-16. Post-operative records reflect that Gordon "tolerated the procedure well"; that she reported her pain as a 2 on a 0-10 scale before discharge, and that her "pain was well controlled with oral pain med[ications]"; that she had a "[f]ull range of motion to flexion and extension" in her neck; and that her neck was not tender to palpitation. R. 1505-10.

In 2017, Gordon presented with mild but chronic knee pain. R. 1518. She had previously been diagnosed with bilateral knee osteoarthritis. *Id.* Her treating physician observed that Gordon had only gotten "minimal relief with Visco supplementation and cortisone injections" and noted that Gordon would be a candidate for total knee arthroplasty once she was cleared from her 2017 cervical spine surgery. *Id.* In May 2017, Gordon was 5 feet 5 inches tall and weighed 218 pounds, resulting in a BMI of approximately 36. R. 1523.

3

The physician who performed Gordon's consultative examination for the agency's disability determination concluded that various physical limitations would be appropriate should Gordon return to work, including limiting standing or sitting, respectively, to six hours of an eight hour work day; largely restricting Gordon's lifting or carrying to 10 pound objects, and lifting or carrying 20 pound objects only occasionally; and prohibiting Gordon's climbing of ladders, ropes, or scaffolding. R. 151-52. These same limitations were endorsed by the physician who performed the agency's reconsideration of its disability determination. R. 178-79.

### C. The ALJ's Decision

After an oral hearing with testimony from Gordon and a vocational expert, the ALJ concluded that Gordon was not under a disability, within the meaning of the Social Security Act, from June 26, 2015, through the date of her decision, issued December 7, 2017. R. 75. Gordon's case was decided in the fourth of the SSA's five-step sequential evaluation process for determining whether an individual is disabled. R. 83-84. At step one, the ALJ "must determine whether the claimant is engaging in substantial gainful activity" as that phrase is defined in 20 C.F.R. § 404.1572(b); the ALJ determined that Gordon had not been engaged in SGA since June 26, 2015. R. 77. At step two, the ALJ found that Gordon suffered from several severe impairments limiting her ability to perform basic work activities: degenerative disc disease of the cervical spine status post fusion and resulting in fusion; degenerative disc disease of the lumbar spine resulting in laminectomy; degenerative joint disease of the knees; and obesity. R. 76-77. She also concluded that Gordon's diverticulitis, gastroesophageal reflux disease, hypertension, diabetes mellitus, chronic kidney disease, headaches, ulnar impairment, cardiac impairment, left shoulder impairment, and depression were non-severe. R. 77-78. The ALJ concluded that Gordon's depression did "not cause more than minimal limitation" in her ability to perform basic mental

4

activities after considering the four "paragraph B" criteria; she determined Gordon suffered no limitation in the functional areas of understanding, remembering, or applying information and adapting or managing oneself, and only mild limitations in the functional areas of interacting with others and concentrating, persisting, or maintaining pace. R. 79. At step three, the ALJ found that Gordon did not have an impairment or combination of impairments that met or medically equaled the severity of one of the SSA's listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 80. Before proceeding to step four, the ALJ concluded that Gordon had a residual functional capacity to perform sedentary work as defined by 20 C.F.R. § 404.1567(a) with additional limitations as follows: only occasional kneeling, crouching, crawling, and climbing of ramps and stairs, and no climbing of ladders, ropes, or scaffolds. R. 81. The ALJ further concluded that Gordon should avoid concentrated exposure to temperature extremes and other hazards like unprotected heights. *Id.* The ALJ did not incorporate any mental limitations into her RFC determination. Finally, at step four, the ALJ found that Gordon is capable of performing her past work as a reservation agent, as it as actually and generally performed, because that job does not require the performance of work-related activities precluded by Gordon's residual functional capacity. R. 83-84. As a result, she concluded that Gordon was not under a disability from the time of her application through the date of the decision. R. 84.

## DISCUSSION

The Social Security Act authorizes judicial review of the final decision of the Commissioner of Social Security. 42 U.S.C. § 405(g). This Court reviews the Commissioner's legal determinations *de novo* and the Commissioner's factual findings deferentially. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). The Commissioner's decision will therefore be upheld if his findings are supported by substantial evidence. *See Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); 42 U.S.C. § 405(g). Substantial evidence consists of "such relevant

5

evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt*, 395 F.3d at 744. The standard requires "more than a scintilla," but can be satisfied by "less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the Commissioner. *See Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner; "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Commissioner must articulate enough detail and clarity in the analysis to allow a reviewing court to conduct meaningful appellate review. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001); *see also Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (explaining the ALJ is "not required to discuss every piece of evidence, but must build a logical bridge from evidence to conclusion"); *Yonts v. Barnhart*, No. 03 C 3420, 2004 WL 1005690, at *2 (N.D. Ill. May 4, 2004) ("It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, the Court must remand.").

Gordon has three objections to the ALJ's decision. She first argues that the ALJ failed to identify the evidentiary basis of her assessment of Gordon's physical RFC. Pl.'s Br. 5, ECF No. 15. She specifically criticizes the ALJ's failure to explain how the evidence in the administrative record supported the particular functional restrictions included in the RFC, rather than a more restrictive assessment of her capacity to perform work tasks. *Id.* Gordon also contends that the ALJ erred in failing to explain if or how she considered Gordon's alleged limitations in maintaining neck flexion. *Id.* at 9-11. Second, Gordon claims that the ALJ erred in assessing her mental RFC.

6

Gordon argues two errors regarding her mental impairments: that the evidence in the record indicated more than a "mild" impairment in concentration, persistence, or pace; and, even if the ALJ's evaluation of Gordon's impairment as "mild" was reasonable, that the ALJ failed to explain why those limitations did not warrant mental restrictions in Gordon's RFC. Pl.'s Br. 11-15. Third, Gordon argues the ALJ erred in evaluating the credibility of Gordon's subjective allegations regarding the intensity, persistence, and limiting effects of her pain and other symptoms. *Id.* at 15. The Commissioner maintains that the ALJ's physical and mental RFC assessments and symptom evaluation were reasonable and made in accordance with SSA regulations. Def.'s Mem. Supp. Summ. J., ECF No. 26.

Gordon's objection to the ALJ's physical RFC assessment is the most persuasive of her arguments, and the ALJ's failure to explain why a neck flexion limitation was unwarranted given the medical evidence in the record and Gordon's own testimony requires remand. The ALJ determined that Gordon suffered from degenerative disc disease of the cervical spine status post fusion and resulting in fusion, a severe, medically determinable impairment that, per SSR 85-28, "significantly limit[s] the ability to perform basic work activities." R. 77. At the oral hearing, Gordon testified that she had undergone neck fusion surgery but had not yet been released by the operating physician; she noted that her neck remained sensitive to the touch and that she had not yet begun physical therapy. R. 108. She further testified that though she had been "weaned" from wearing a cervical brace, she had significant difficulty turning her head from left to right, that her neck became "really tired" while driving, and that she only used her laptop at eye level. R. 109. Gordon said that while she was physically able to look down for periods of time, it was "kind of hard to do" because it "starts hurting after a while." R. 109-10. She also testified that the radiating pain she experienced before surgery, which seemingly interfered with her ability to operate a

7

keyboard, had resolved. R. 110. During the vocational expert's testimony, the ALJ posed a hypothetical assuming an individual of Gordon's age, education, and work experience, performing work at the sedentary level with some exertional and postural limitations, and inquired whether that individual could perform Gordon's previous work as a reservation agent. R. 121-22. The vocational expert responded in the affirmative. *Id.* The ALJ then asked whether the same individual would be able to perform Gordon's past work if the individual could only occasionally sustain neck flexion to look at a computer screen. R. 122. The vocational expert noted that the "DOT ("Dictionary of Occupational Titles") doesn't address that," but concluded no, given the amount of computer work involved in the role of a reservation agent. *Id.*

Though she inquired about the consequences of such a limitation with the vocational expert, the ALJ did not ultimately adopt a neck flexion restriction in Gordon's RFC. The ALJ noted Gordon's testimony that she used her laptop at eye-level due to the pain caused by sustained neck flexion in her finding. R. 81-82. However, the ALJ concluded that Gordon's "statements about the intensity, persistence, and limiting effects of his or her symptoms, . . . are inconsistent because the medical evidence of record indicates that the claimant responded well to a laminectomy and recent cervical discectomy and fusion," such that her spinal impairments did not preclude her from performing sedentary work with the additional limitations the ALJ incorporated into her RFC. R. 82. The ALJ observed that "[p]ost-operative imaging has shown stable changes" and that Gordon's "radicular symptoms had already resolved." *Id.*

A claimant's RFC is based upon "medical evidence as well as other evidence, such as testimony by the claimant or [her] friends and family." Social Security Ruling 96-8p states that the ALJ's RFC assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical

8

and other evidence." SSR 96-8p. An ALJ may conclude that a claimant's testimony is non-credible, and a court must "uphold an ALJ's credibility determination if the ALJ gave specific reasons for the finding that are supported by substantial evidence." *Moss v. Astrue*, 555 F.3d 556 (7th Cir. 2009). But an ALJ "cannot disregard subjective complaints of disabling pain just because a determinable basis for pain of that intensity does not stand out in the medical record," *id.*, and, even if the claimant's allegations are otherwise non-credible, an ALJ must always "articulate her reasons for rejecting a plaintiff's complaints of pain." *Nam v. Saul*, No. 19 C 7832, 2020 WL 6781800, at *3 (N.D. Ill., Nov. 18, 2020), *citing Myles v. Astrue*, 582 F.3d 672, 676-77 (7th Cir. 2009) (finding the ALJ erred in failing to analyze plaintiff's claims of fatigue and hand limitations; though the ALJ "acknowledged these complaints, . . . his analysis does not articulate his reasons for rejecting them, except to say there is no objective medical evidence to support them").

Remand is appropriate here because the ALJ failed to articulate her reasoning for omitting a neck flexion limitation. The only justification the ALJ provides for her conclusion that Gordon's testimony is "not entirely consistent" with the medical evidence is that post-operative image showed stable changes in the cervical spine and that Gordon's radicular symptoms had improved by the time of the oral hearing. R. 82. But the ALJ's opinion does not build a logical bridge between the observation that, less than two weeks after surgery, imaging revealed "[s]table postop changes," R. 1468, and the ALJ's conclusion that Gordon's testimony, more than two months later, was non-credible. The propositions that 1) the surgery went well and 2) Gordon was nonetheless unable to maintain neck flexion for a prolonged period without pain are not necessarily inconsistent—patients often require physical or occupational therapy after successful surgeries to build the strength, flexibility, and range of motion to return to their previous standard of living, if

9

that is even possible.² Nor does the ALJ explain why she credits, on the one hand, Gordon's testimony that her radicular symptoms had resolved, but does not, on the other hand, credit her testimony regarding neck flexion limitations. It may well be that the medical evidence in the record regarding Gordon's claimed flexion limitations is inconsistent with the restrictions and level of pain Gordon describes, and it is possible that the ALJ will reach the same conclusion on remand. But "[i]f the ALJ found that [Gordon] had no limitation in the movement of [her] neck, [s]he should have addressed the medical evidence related to this issue"; instead, because the "ALJ's analysis contains no explanation as to why any neck-related restrictions were not included in the RFC," this Court cannot provide meaningful review of whether the omission of such a limitation is supported by substantial evidence. *Trevino v. Colvin*, No. 15 C 7818, 2016 WL 7049056, at *7 (N.D. Ill. Dec. 5, 2016).

The ALJ's failure to explain how the medical evidence in the record was inconsistent with Gordon's claimed limitation, moreover, was not harmless. The vocational expert testified that an individual with Gordon's RFC and an inability to maintain neck flexion would not be able to perform Gordon's past work as a reservation agent, given the level of computer work involved. R. 122. Gordon argues that if she was deemed unable to perform her past work as a reservation agent, SSA regulations would have "mandated the ALJ to find that Ms. Gordon was disabled as of the alleged disability onset date," given her age, level of education, lack of transferable work skills,

---

² Additional medical records submitted to the agency after the ALJ's December 2017 decision corroborate Gordon's complaints. The RFC questionnaire completed by Dr. Degaspi, for example, indicates Gordon's cervical range of motion is significantly limited, and that her cervical spine flexion is limited to thirty degrees. R. 9. As the Appeals Council noted, this evidence post-dates the period included in the ALJ's decision, and so is not part of the record under consideration on remand. R. 2. It does suggest, however, that Gordon may have a more robust evidentiary basis for a claimed disability period beginning after December 12, 2017, should benefits be denied again on remand.

10

and exertional limitations. Pl.'s Br. 10. If correct, the ALJ's decision not to include the limitation was dispositive. After entertaining a neck flexion limitation in her hypothetical to the vocational expert, the ALJ failed to adequately explain how that limitation was unsupported by the medical and other evidence in the record.

Because the ALJ's error warrants remand, Gordon's remaining objections regarding the ALJ's failure to incorporate a mental limitation in her RFC and the ALJ's credibility assessment need not be resolved. However, the Court calls the ALJ's attention to the Seventh Circuit's most recent reminder that an "RFC assessment must incorporate all of the claimant's limitations supported by the medical record, including even moderate limitations in concentration, persistence, or pace." *Lothridge v. Saul*, No. 20-1269, 2021 WL 37503, at *5 (7th Cir. Jan. 5, 2021); *see also Alesia v. Astrue*, 789 F. Supp. 2d 921, 933-34 (N.D. Ill. 2011) (remanding because the ALJ did not consider the impact of the claimant's non-severe depression, which caused mild limitations in concentration, persistence, or pace and two other functional areas, in his RFC); *Koswenda v. Astrue*, No. 08 C 4732, 2009 WL 958542, at *5 (N.D. Ill. Apr. 2, 2009) (remanding for further assessment of the claimant's RFC, and noting that even mild limitations in concentration, persistence, or pace should have been included in hypothetical questions to the vocational expert). The record suggests that Gordon's depression was well-managed with anti-depressants, so a vocational expert and the ALJ may nonetheless reasonably conclude that her mental impairments do not impact her ability to perform her past work. But no matter her conclusion, the ALJ's reasoning for incorporating or rejecting a mental limitation in Gordon's RFC should be elucidated on remand.

*     *     *

For the foregoing reasons, the Commissioner's decision is reversed and remanded for further proceedings consistent with this opinion, and the Commissioner's motion for summary judgment, Dkt. 25, is denied.

Dated: January 11, 2021

John J. Tharp, Jr.
United States District Judge